(C. D. 1351)

OLIVA TOBACCO COMPANY, INC. *v.* UNITED STATES

United States Customs Court, First Division

(Decided July 25, 1951)

*E. O. Palermo* for the plaintiff.

*David N. Edelstein,* Assistant Attorney General (*Harold L. Grossman,* special attorney), for the defendant.

Before OLIVER, COLE, and MOLLISON, Judges; COLE, J., concurring

MOLLISON, Judge: The merchandise the subject of these protests consists of 60 bales of unstemmed leaf tobacco the product of and imported from Cuba. For the purpose of assessment of duties upon leaf tobacco the product of one country or dependency and not mixed or packed together with that of another country or dependency, the Tariff Act of 1930 provides two classifications, viz, wrapper tobacco and filler tobacco, and defines the two classifications in paragraph 602 of the said act as follows:

The term "wrapper tobacco" as used in this title means that quality of leaf tobacco which has the requisite color, texture, and burn, and is of sufficient size for cigar wrappers, and the term "filler tobacco" means all other leaf tobacco.

The provisions of law assessing duty upon leaf tobacco with which we are here concerned are those found in paragraph 601 of the tariff act, as modified by the exclusive agreement between the United States of America and the Republic of Cuba reported in T. D. 51819, supplementary to the General Agreement on Tariffs and Trade reported in T. D. 51802, the said provisions as applied to the products of Cuba reading as follows:

Wrapper tobacco, and filler tobacco when mixed or packed with more than 35 per centum of wrapper tobacco, if unstemmed_____ 91¢ per lb.

Filler tobacco (except cigarette leaf tobacco) not specially provided for:

If unstemmed------------------------------------------------ 14¢ per lb.

On the ground that the involved bales of leaf tobacco contained varying amounts of both wrapper and filler tobacco and that the quantity of each kind of tobacco could not be readily ascertained by the customs officers, the collector of customs assessed all of the merchandise with duty at the rate applicable to wrapper tobacco under the provisions of section 508 of the Tariff Act of 1930. The latter section, entitled "Commingling of Goods," reads as follows:

Whenever dutiable merchandise and merchandise which is free of duty or merchandise subject to different rates of duty are so packed together or mingled that the quantity or value of each class of such merchandise can not be readily ascertained by the customs officers, the whole of such merchandise shall be subject to the highest rate of duty applicable to any part thereof, unless the importer or consignee shall segregate such merchandise at his own risk and expense under customs supervision within ten days after entry thereof, in order that the quantity and value of each part or class thereof may be ascertained.

It is the plaintiff's contention that the bales involved contained no wrapper tobacco but only filler tobacco and that the same should have been assessed with duty at the rate applicable to filler tobacco, viz, 14 cents per pound.

Four witnesses testified on behalf of the plaintiff, the first of whom was Angel Oliva, the president of the plaintiff corporation, who had

personally purchased the tobacco here involved in Cuba. Mr. Oliva, who had 25 years' experience in growing, selling, and dealing in tobacco, stated that the 60 bales of tobacco in issue were graded and offered by the sellers in Cuba as filler tobacco, and that at the time of purchase he examined each individual bale and concluded that it was binder tobacco, which is a type of filler tobacco, and is not wrapper tobacco. His conclusion, he said, was based upon the texture, thickness, and size of the leaf, and upon his 25 years of experience, and he purchased the tobacco in Cuba for binder purpose, and sold it in the United States as binder tobacco.

On cross-examination, the witness testified that his examination of the bales in Cuba at the time of purchase consisted of opening the bales and seeing 1 carrot, composed of 4 hands, each hand containing an unspecified number of leaves. He admitted that he did not specifically examine all 4 hands from each carrot, and further testified—

X Q. Did you examine more than one hand in any bale?—A. Sometimes we do not even open the hand, we just look at random.

X Q. In other words, sometimes you merely look at the carrot, make your spot judgment and return it?—A. Yes. (Tr. pp. 16–17.)

It should be noted at this point that apparently the tobacco involved was graded in Cuba into four grades and the bales marked accordingly 14aS, Rgo. 17 S, Rgo. 17 S. V., or Rgo. 17 V. The significance of these grades, or whether they had any relationship to the question of whether the bales contained wrapper or filler tobacco, was not brought out in the record. It also should be said that although it was not clearly brought out in the record, apparently in the packing of leaf tobacco a number of leaves are first bound together into a unit called a "hand," and that 4 hands are assembled into what is called a "carrot," possibly from its shape, which is tied with a string.

Plaintiff next called to the stand Edward W. Berriman, a cigar manufacturer of 36 years' experience, including the purchase of tobacco in the field and in the warehouses in Cuba, and in packing the same, and in handling tobacco in this country. He stated that in December 1948, in company with a Mr. Cuesta and a Mr. Perez, he examined the lot of tobacco here involved at the appraiser's stores in Tampa. It developed, however, that he did not examine each bale of the 60 bales involved, and his testimony is somewhat inconsistent as to just how many he did examine, although he testified from notes he made at the time of his examination.

At one point in his testimony, he said there were from 2 to 3 bales of each of 4 grades laid out for examination, which would make a total of 8 to 12 bales; later, however, he said that there were 3 or 4 bales of each grade, which would make a total of 12 to 16 bales. At any rate, he did not see the remainder of the bales, and his judgment that the

bales he examined were representative of the remainder was based upon the statements made on the invoices.

The examination bales were not selected by him, and his examination consisted of taking 1 or 2 carrots from the second row of each bale. In some cases, he broke the string of one of the carrots and in some cases of the two, and opened the carrot, exposed the 4 hands, smelled it, and looked at it for size and texture, and made his survey.

Karl B. Cuesta, a cigar manufacturer who had been connected with the tobacco industry since 1912 as a buyer, packer, and processor of tobacco, testified that he examined 8 bales of the tobacco here in question at the time that Mr. Berriman and Mr. Perez examined it and found it to be "very leafy; in fact, large, a type of tobacco that is not commonly to my knowledge grown in Cuba" and "possibly suitable for binders" and could not be used for wrappers; that it—

* * * was absolutely void of a texture, in other words, it had no sheen to it; had no elasticity * * *.

He also found the bales he examined to be musty, having a foreign odor to them.

Mr. José P. Perez, a leaf tobacco broker with experience in the tobacco business dating from 1905, testified that he examined 7 bales, and found the tobacco to have—

* * * a tendency to be over-sized, long, and stringy on the tail. The usual Cuban tobacco is round like what we call a Cuban leaf, round heart shaped. This was long and stringy and much larger. It didn't have the usual oil, the consistency or the grain that you find in the usual Cuban leaf. (Tr. p. 48.)

In his opinion it was binder tobacco, something to hold the filler together, but he would not consider it as wrapper.

On cross-examination, he testified that he put a leaf of the tobacco he examined on a cigar and smoked the cigar to test the burn and found that the ash was black, instead of white, the latter indicating a perfect burn. He admitted that it might be used as a wrapper on a cheap class of cigar, but not on a clear Havana cigar.

The case for the defendant rested upon the testimony with respect to the examination given to the tobacco by the customs examiners for the purpose of classification. A customs verifier testified that on November 5, 1948, at the appraiser's stores in Tampa, he opened *each of the 60 bales here involved* and removed from each of such bales 3 carrots, broke or removed the string from one of the carrots, took a hand therefrom, and placed it in front of one examiner, Vernon Elarbee, and then broke another carrot and took a hand therefrom and placed it in front of the other examiner, E. R. Kirkland. After the examination was finished, he replaced each hand in the carrot from which it was taken and rebound the string around it, tied it, carried it back, and put in the bale.

Mr. Kirkland, called by the defendant, identified himself as United States Appraiser of Merchandise at Tampa, with 16 years' experience in the customs service in the examination of tobacco. His description of the examination given the tobacco was as follows:

Q. Will you please tell the Court what you did at that time and what you found?—A. Well, they bring in three carrots out of each bale. They opened two carrots taking one hand from each, give one examiner one carrot and the other examiner another one. We take this one hand, loosen the leaves all up and go through it leaf by leaf and count the number of leaves that we grade as wrappers, then we check the total number of leaves in that hand. For instance, if we have a hand that has 52 leaves and we find eight wrapper leaves in it, then we figure the percentage on the basis of that. The other examiner is doing the same thing which means that we count the wrapper leaves in two hands.

Q. From each bale?—A. From every bale, and figure your percentage on the basis of what is found in those two hands.

Q. As I understand it, when the hands of a definite bale were being examined, you would examine a hand from one bale and Mr. Elarbee would examine another hand from a different carrot of the same bale?—A. That is right.

Q. So that simultaneously, you and Mr. Elarbee were examining individual carrots, hands, hands from individual carrots of the same bale?—A. That is right.

Q. And you would specifically examine each and every leaf in that hand?—A. In those two hands, that's right.

Q. And, based upon that examination you would make a determination as to the type of tobacco, whether wrapper or filler in that hand?—A. That is right, that is correct.

Q. And when you made that determination, based upon your experience, you conveyed the figure to Elarbee?—A. That is right. He has a worksheet showing the bale number, grade, the price, the province and the year of the crop of every bale. (Tr. pp. 58–60.)

The worksheet referred to was received in evidence as defendant's exhibit A.

The witness testified that he found that the tobacco involved—

*   *   *   didn't run uniform. In other words, it clearly showed that it had not been properly graded and packed   *   *   *

and that it contained filler tobacco, and larger leaves that were very coarse and could be used for binder, and also—

*   *   *   other leaves of a much better texture that could be used as wrappers and those are the ones that we classified as wrappers. (Tr. p. 62.)

The witness stated that although the amount of wrapper leaves in each *hand* could be readily ascertained by his examination, nevertheless, the bales were so unevenly constituted that the determination as to 1 or 2 hands could not be used—

*   *   *   as a basis for ascertaining the balance of the bag. We found instances in one hand we had examined, it may have two or three wrappers; in the next hand, it might have 15 or 20. (Tr. p. 63.)

On cross-examination, the witness testified that he used texture, burn, color, and size as the standards of what constituted wrapper tobacco and that that portion classified as wrapper had all those four qualities. He stated that the tobacco had no special characteristics to denote it as different from the usual run of Cuban tobacco, and that while it was large leaf tobacco, he did not notice that it was any larger than other leaves he had seen in Havana provinces.

He also stated that in making his examination he wet some of the leaves, but that "most any other tobacco has to be wet," and that when wet the veins smoothed out and did not come back up any more than it does in any other tobacco. The witness said that the tobacco had a slight musty odor "no more than thousands of other types of filler tobacco and wrapper tobacco that was brought in through this port had."

Vernon R. Elarbee, a customs examiner whose qualifications were conceded by the plaintiff's attorney, corroborated the testimony of Mr. Kirkland as to the examination and making of the worksheet, defendant's exhibit A. The witness also testified that on February 23, 1949, he personally examined 2 hands each from a different carrot from each of the 20 bales covered by entry 258, and on March 23, 1949, he personally examined 2 hands each from 2 individual carrots from each of the 40 bales covered by entry 449, and made an official record of his findings as worksheets, which were offered and received in evidence as defendant's exhibits B and C, respectively.

The witness described the examination procedure as follows:

When a hand was placed before me for examination and in the examination room that we have, we have a north light that is very clear and it is suitable for examining tobacco. Each leaf is opened up individually, spread, stretched, tested for burn, through the whole hand; that is, each leaf is opened and spread throughout the hand. At the end of going through the hand, we count the number of leaves in that hand to determine how many leaves we have examined. If we examine 50 leaves, if I examined 50 leaves and at the time Mr. Kirkland, he asked 50 leaves, the combined examination with the 100 leaves actually examined, so if I found three wrapper leaves and Mr. Kirkland found five wrapper leaves, we would figure the percentage at 8 per cent. (Tr. pp. 77-8.)

With respect to the question of whether the quantity of wrapper tobacco and of filler tobacco packed in each bale could be readily ascertained, the witness testified:

A. As I recall the shipment, there were various sized leaves, and in fact, it appeared to be that they were never graded. They were narrow, wide, there were various colored leaves, it appeared to be what we call a field run tobacco that had never been graded due to the fact that it had various sizes, various textures, and the broken leaves, and torn leaves together with the good ones.

Q. In other words, you would say that these hands contained that and were indiscriminately mixed?—A. Yes, sir. (Tr. p. 80.)

The final witness called by the defendant was the United States Treasury representative in charge at Havana, Cuba, who stated that a conference took place in his office on December 16, 1948, at which Mr. Oliva, Mr. Manuel Hernandez Garcia, identified as the exporter of the tobacco here involved, and a Mr. José Martinez, were present. The record does not disclose the capacity in which or the party for whom Mr. Martinez acted, or his interest in the subject matter. The purpose and result of the conference as disclosed by the record seem to be somewhat vague, indefinite, and nebulous. On cross-examination, the Treasury representative admitted that Mr. Hernandez told him that the tobacco in question would be used for binders.

There are a primary and a secondary question to be determined in this case. The primary question is whether any wrapper tobacco was contained in the bales imported, and, if so, the secondary question is whether the quantity of wrapper tobacco contained in each bale could be readily ascertained by the customs officers.

On the primary question, the testimony of the witnesses is irreconcilable, but we are satisfied from a careful review of all of the evidence that the preponderance in weight is in favor of the defendant. While it is true that the witnesses for the plaintiff were men of many years' experience in all branches of the tobacco business, nevertheless, the witnesses for the defendant were likewise shown to have had long experience, particularly in the examination of imported tobacco. The most that may be said is that the qualifications of the witnesses for both sides were on a parity.

In this situation, the nature and extent of the examination of the tobacco made by each of the witnesses must be taken into consideration, and in this regard it is at once apparent that the witnesses for the defendant made a much more thorough and detailed examination of the tobacco involved, and each bale thereof, than did the witnesses for the plaintiff.

In his examination of the tobacco in Cuba, witness Oliva saw 1 carrot from each bale, but sometimes made a spot judgment upon the carrot without opening the hands. Witness Berriman's testimony as to the number of bales he examined at the appraiser's stores is inconsistent, but it ran from 8 at the least to 16 at the most. Cuesta examined eight, and Perez seven, and apparently all three examined the same bales. Thus it appears that, at the most, 16 of the 60 bales involved were examined by the last three witnesses, while the customs examiners examined all of the 60 bales. Furthermore, none of the plaintiff's witnesses indicated a leaf-by-leaf examination of the tobacco such as was given by the customs examiners.

It may very well be that the examination given by the plaintiff's witnesses would be sufficient upon which a reasonable person in the

tobacco business might purchase the tobacco in issue *as a lot* as filler tobacco, particularly when, as here, filler tobacco is the lower of two classes of tobacco, but customs classification of tobacco rests upon more particular standards with respect to the exact nature of the tobacco contained in each imported bale or package.

We conclude that a preponderance in weight of the evidence offered establishes that wrapper tobacco was mixed or packed with filler tobacco in the bales involved. The tariff provisions contemplate that such a situation may occur, and when the percentage of wrapper tobacco so mixed or packed is 35 percent or less, duty is ordinarily separately charged upon the amount of wrapper tobacco while the remainder of the tobacco takes the filler tobacco rate. Paragraph 601, *supra*, and *Rothschild* v. *United States*, 179 U. S. 463, 45 L. ed. 277. If the percentage of wrapper tobacco so mixed or packed is more than 35 percent, the entire bale, box, or package takes the wrapper tobacco rate. Paragraph 601, *supra*.

It is obvious that in cases where the percentage of wrapper tobacco contained in a bale, box, or package is 35 percent or less, in order to secure the privilege of paying duty only on the amounts of wrapper tobacco and filler tobacco at the appropriate rates applicable thereto, either the tobacco must be so packed that the amounts of each type of tobacco can be readily ascertained by the customs officers, or the entire contents of the bale, box, or package must be segregated and the amounts of each type of tobacco determined, and the burden of doing the work of segregation rests upon the importer, who, in this case, made no effort to meet such burden.

The plaintiff offered no evidence to controvert the finding of the collector inherent in the invocation of section 508, *supra*, that the quantity of wrapper tobacco contained in any of the bales here involved was not readily ascertainable by the customs officers, and, moreover, the evidence offered on behalf of the defendant establishes that such was the fact. In the absence of segregation as provided by section 508, *supra*, assessment of duty at the rate applicable to wrapper tobacco was therefore warranted under the commingled goods provision.

Judgment will therefore issue overruling the claim made in each of the protests accordingly.

### CONCURRING OPINION

COLE, Judge: This case was heard and submitted before a single member of this court on circuit under statutory authorization issued by the chief judge to hear or to hear and determine the case (28 U. S. C., 1946 ed., Supp. III, § 254).

My views set forth in *Geo. S. Bush & Co., Inc., et al.* v. *United States*, 22 Cust. Ct. 158, C. D. 1175, questioning the jurisdiction of

the division to decide a case similar to these proceedings, continue as the minority expression from the division. Under the practice and procedure of the court and the rules applicable thereto, much litigation before the court is dependent upon my participation in a decision of the same. Adhering, however, to my views expressed in the *Bush* case, *supra*, but for the purpose of expediting the work of the court, I am joining my colleagues in the disposition of this case, and concur in the opinion and judgment attached thereto.